1

2

3                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
4                              AT SEATTLE

5    ANTHONY M. SEIBEL and MISSY M.
     PHELPS,
6
                           Plaintiffs,
7
                                                      C14-1973 TSZ
          v.
8
                                                      ORDER
     NANCY A. BERRYHILL, Acting
9    Commissioner of the Social Security
     Administration,[1]
10
                           Defendant.
11

12        THIS MATTER comes before the Court on appeal from final decisions of the

13   Acting Commissioner of the Social Security Administration ("Commissioner") denying

14   plaintiffs Anthony M. Seibel's and Missy M. Phelps's applications for disability

15   insurance benefits ("DIB") and supplemental security income ("SSI") benefits under

16   Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. §§ 401-434 and

17   1381-1383f.[2]  Having reviewed all papers filed in connection with the appeal, the Court

18   enters this order.

19   _____

20   [1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is hereby substituted for former
     Acting Commissioner Carolyn W. Colvin as the named defendant in this action.

21   [2] Plaintiffs initiated this litigation as a class action, brought on behalf of certain individuals whose
     applications for DIB and SSI benefits were denied after September 2012 following a hearing before
22   Administrative Law Judge Ilene Sloan.  See 1st Am. Compl. (docket no. 9).  Plaintiffs asserted five

23

ORDER - 1

1   **Background**

2   **A.   Anthony M. Seibel**

3        Plaintiff Anthony (aka Anton) Michael Seibel was born in 1986.  AR 25.  He has a

4   high school education, and was previously employed as a forest worker, prep cook,

5   plumber's helper, and tearista (tea expert).  _Id._  In his DIB and SSI applications, Seibel

6   alleged that the onset date of his disability was August 7, 2009.  AR 11; _see also_ AR 209,

7   216, & 224.  In denying Seibel's DIB and SSI applications, Administrative Law Judge

8   ("ALJ") Ilene Sloan found that Seibel has the following severe impairments:  marijuana

9   dependence and bipolar disorder.[3]  AR 13.  ALJ Sloan further concluded that Seibel has

10

11   claims, including violations of 42 U.S.C. §§ 405(b)(1) & 1383(c)(1), the Administrative Procedure Act,
12   and the Due Process Clause of the Fifth Amendment to the United States Constitution.  By Minute Order
     dated August 21, 2015, docket no. 23, the Court dismissed with prejudice for lack of jurisdiction all
     claims other than the fifth one for judicial review pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3).

13   [3] Seibel was diagnosed by different practitioners with a range of psychiatric disorders, including bipolar
14   disorder, schizophrenia, psychosis not otherwise specified ("NOS"), mood disorder NOS, and panic
     disorder without agoraphobia.  ALJ Sloan concluded that bipolar disorder best describes Seibel's mental
     impairment.  AR 13-14.  ALJ Sloan further explained that, regardless of the nomenclature used to label
15   Seibel's impairment, she had considered all of his symptoms.  AR 14 & n.1.  Seibel has assigned error to
     ALJ Sloan's decision not to include schizophrenia, psychosis NOS, or panic disorder among his severe
16   impairments and not to include hallucinations, delusions, paranoia, or panic attacks among his limitations.
     The record does not support Seibel's position.  In December 2009, Seibel's primary care physician at the
17   time, Bradley S. Roter, M.D., prescribed Geodon (generically known as ziprasidone, an antipsychotic) in
     response to Seibel's report that he was hearing voices and experiencing intermittent paranoia.  AR 463.
18   By March 2010, Seibel was taking 60 mg of Geodon qhs (every night at bedtime), and he told Dr. Roter
     that the medication helped him ignore the voices and made him more comfortable around people.
     AR 453.  Dr. Roter observed Seibel to be in no apparent distress, to be oriented to time, place, and person,
19   and to show no signs of pressured speech.  _Id._  In January 2011, shortly after Seibel began treating with
     Mary Montgomery, A.R.N.P., Seibel stated that he no longer had paranoia.  AR 873.  Seibel continued to
20   see Nurse Montgomery until February 2013, which was a little over two months before the hearing
     conducted by ALJ Sloan, by which time he had ceased using Geodon, apparently because it made him
21   feel nauseous, and he insisted that he was psychosis free and no longer wanted to take the medication.
     AR 866.  Given indications in the record that Seibel's psychotic symptoms had dissipated over the period
22   from December 2009 to February 2013, ALJ Sloan appropriately omitted psychotic disorders from the list
     of severe impairments, and did not err in assessing Seibel's residual functional capacity without reference
     to hallucinations, paranoia, and the like.

23

1   the residual functional capacity[4] to perform past relevant work as a forest worker and

2   prep cook and also to make an adjustment to other occupations (for example, a grain

3   picker, drier takeoff tender, park groundskeeper, or routine clerk) as to which a

4   significant number of jobs exist in the national and regional economy.  AR 25-26.  As a

5   result, ALJ Sloan ruled that Seibel "has not been under a disability . . . from August 7,

6   2009, through the date of this decision," which was issued on May 22, 2013.  AR 26-27.

7   The Appeals Council denied Seibel's request for review, AR 1-4, and he seeks judicial

8   review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

9   **B.**    **Missy M. Phelps**

10      Plaintiff Missy M. Phelps was born in 1980.  AR 22.  She has a high school

11   education, and was previously employed as a baker's helper, janitor, plant care worker,

12   bagger checker, reservations agent, and cashier/checker.  _Id._  In her DIB and SSI

13   applications, Phelps alleged that the onset date of her disability was March 22, 2010, but

14   she later amended the date to June 1, 2012.  AR 13; _see_ AR 35, 220, 227.[5]  In denying

15   Phelps's DIB and SSI applications, ALJ Sloan found that Phelps has the following severe

16   impairments:  degenerative disc disease, carpal tunnel syndrome, obesity, depression, and

17   _____

18   [4] ALJ Sloan summarized Seibel's residual functional capacity as follows:  "[C]laimant has no exertional
19   restrictions.  He can understand, remember and carry out simple tasks as well as some detailed tasks.  The
    claimant should not perform tandem tasks or tasks involving a cooperative team effort.  Contact with the
    general public should not be an essential element of any task, but incidental contact is not precluded.  The
20   claimant can adapt to routine changes in a workplace setting."  AR 16.

21   [5] The record contains four separate DIB application summaries, setting forth different disability onset
    dates, namely April 30, 2008, August 11, 2008, February 22, 2010, and March 22, 2010.  AR 200, 207,
22   214, 220.  The sole SSI application summary lists March 22, 2010, as the date on which Phelps alleged
    her disability began.  AR 227.  Phelps's motion to amend the disability onset date to June 1, 2012, was
    made orally during the hearing before ALJ Sloan.  AR 35.

23

ORDER - 3

1    anxiety.  AR 15.  ALJ Sloan further concluded that Phelps is unable to perform past

2    relevant work, but has the residual functional capacity[6] to make an adjustment to other

3    occupations (for example, housekeeper, small products assembler, electronics worker,

4    laminating machine off bearer, and bakery worker conveyor line inspector) as to which a

5    significant number of jobs exist in the national and regional economy.  AR 22-23.  As a

6    result, ALJ Sloan ruled that Phelps "has not been under a disability . . . from June 1,

7    2012, through the date of this decision," which was issued on July 15, 2013.  AR 24.  The

8    Appeals Council denied Phelps's request for review, AR 1-4, and she seeks judicial

9    review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

10   **Discussion**

11          This Court's review is limited to assessing whether the ultimate denial of benefits

12   is free of legal error and based on factual findings that are supported by substantial

13   evidence.  *See* *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998); *see also* 42 U.S.C.

14   § 405(g).  Substantial evidence means "more than a mere scintilla, but less than a

15   preponderance" of evidence; it is "such relevant evidence as a reasonable person might

16   accept as adequate to support a conclusion."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035

17   (9th Cir. 2007).  In determining whether the factual findings are supported by substantial

18   evidence, the Court must "review the administrative record as a whole, weighing both

19   _____

20   [6] ALJ Sloan assessed Phelps as having the residual functional capacity to perform light work, indicating
     that Phelps can "frequently balance, kneel, crouch, and climb ramps and stairs" and "occasionally stoop
21   and climb ladders, ropes, and scaffolds," but cannot crawl, can "frequently handle and finger bilaterally"
     and can "understand, remember, and carry out simple, detailed, and complex tasks."  AR 18.  ALJ Sloan
22   further surmised that, for Phelps, contact with the general public "cannot be an essential element of any
     task," but "incidental public contact is not precluded."  *Id.*

23   ORDER - 4

1   the evidence that supports and the evidence that detracts from the Commissioner's

2   conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  The Court "may not

3   affirm simply by isolating a specific quantum of supporting evidence." <u>Jones v. Heckler</u>,

4   760 F.2d 993, 995 (9th Cir. 1985).  If, however, the evidence reasonably supports both

5   affirming and reversing the denial of benefits, the Court may not substitute its judgment

6   for that of the ALJ.  <u>See Reddick</u>, 157 F.3d at 720-21; <u>see also</u> <u>Thomas v. Barnhart</u>, 278

7   F.3d 947, 954 (9th Cir. 2002) (if "the evidence is susceptible to more than one rational

8   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be

9   upheld").

10         To determine whether a claimant is "disabled" within the meaning of the Social

11   Security Act, the Commissioner must use a five-step sequential process.  Step one of the

12   process inquires whether the claimant is presently engaged in "substantial gainful

13   activity."  20 C.F.R. §§ 404.1520(a)(4)(i) & 416.920(a)(4)(i); <u>see also</u> <u>id.</u> at §§ 404.1572

14   & 416.972 (defining "substantial gainful activity").  If so, the claimant is not entitled to

15   disability benefits, and no further evaluative steps are required.  <u>Id.</u> at §§ 404.1520(b) &

16   416.920(b).  Step two asks whether the claimant has a severe impairment, or a

17   combination of impairments, that significantly limits the claimant's physical or mental

18   ability to do basic work activities.  <u>See</u> <u>id.</u> at §§ 404.1520(a)(4)(ii)&(c) and

19   416.920(a)(4)(ii)&(c).  If not, the claimant is not entitled to disability benefits, and again,

20   additional analysis is not required.  <u>Id.</u>  Step three involves a determination of whether

21   any of the claimant's severe impairments is equivalent to one that is listed in the

22   regulations.  <u>Id.</u> at §§ 404.1520(a)(4)(iii) & 416.920(a)(4)(iii).  A claimant with an

23

1   impairment that "meets or equals" a listed impairment for the requisite twelve-month

2   duration is "per se" disabled and qualifies for benefits.  *See id.* at §§ 404.1520(d) &

3   416.920(d).

4        If the claimant is not "per se" disabled, then the question under step four is

5   whether the claimant's "residual functional capacity" enables the claimant to perform

6   past relevant work.  *Id.* at §§ 404.1520(a)(4)(iv) & 416.920(a)(4)(iv).  If the claimant can

7   still perform past relevant work, then the claimant is not entitled to disability benefits and

8   the inquiry ends there.  *Id.* at §§ 404.1520(e)-(f) & 416.920(e)-(f).  On the other hand, if

9   the opposite conclusion is reached, the burden shifts to the Commissioner at step five to

10  prove that the claimant can make an adjustment to other work, taking into account the

11  claimant's age, education, and work experience.  *Id.* at §§ 404.1520(a)(4)(v) &

12  416.920(a)(4)(v); *see id.* at §§ 404.1560(c)(2) & 416.960(c)(2).  If the claimant cannot

13  make such adjustment to other work, disability benefits may be awarded.  *Id.* at

14  §§ 404.1520(g) & 416.920(g).

15       Plaintiffs present five issues for the Court's consideration:  (i) whether each of the

16  administrative records[7] is complete; (ii) whether each plaintiff's receipt of benefits from

17  Washington's Department of Social and Health Services ("DSHS") should have been

18  considered by ALJ Sloan; (iii) whether ALJ Sloan adequately supported and/or explained

19  her evaluation of each plaintiff's credibility; (iv) whether the opinions of certain

20  practitioners were properly discounted, resulting in an appropriate assessment of each

21  _____

22  [7] The administrative record for each plaintiff has been separately filed.  *See* AR (Seibel) (docket no. 25); AR (Phelps) (docket no. 26).

23

1    plaintiff's residual functional capacity; and (v) whether due weight was given to each

2    plaintiff's various Global Assessment of Functioning ("GAF") scores.  These arguments

3    are addressed seriatim below.

4    **A.**      **<u>Administrative Record</u>**

5           Plaintiffs assert that certain materials should be incorporated into their respective

6    administrative records.  The Court has rejected similar arguments made by plaintiffs'

7    attorney in other cases.  <u>See</u> <u>Smith v. Colvin</u>, 2016 U.S. Dist. LEXIS 144401 at *8-*14

8    (W.D. Wash. Oct. 14, 2016); <u>Mostafavinassab v. Colvin</u>, 2016 WL 4547129 at *1 n.1

9    (W.D. Wash. Sep. 1, 2016); <u>Yost v. Colvin</u>, 2016 WL 2989957 at *2-*5 (W.D. Wash.

10   May 24, 2016); <u>see also</u> <u>Cope v. Colvin</u>, 2016 WL 6439940 at *7-*11 (W.D. Wash.

11   Nov. 1, 2016).  Although these other appeals involved different ALJs, the reasoning in

12   the earlier decisions applies equally to this matter -- a non-random[8] assortment of an

13   ALJ's prior decisions does not establish bias on the part of the ALJ.  As in the other

14   cases, in this matter, plaintiffs' attempt to infer prejudice from statistical comparisons

15

16

17   _____

18   [8] Among the materials alleged to be missing from the administrative records are 84 decisions issued by
     ALJ Sloan between September 27, 2012, and June or July 2013, copies of which were on compact discs
     enclosed with plaintiffs' counsel's letters to the Appeals Council, one dated September 20, 2013,

19   regarding Seibel, Ex. 23E, and the other dated September 19, 2013, concerning Phelps, Ex. 13E.  Those
     84 decisions involved claimants represented by a small number of law firms, including Schroeter,

20   Goldmark & Bender.  None of these decisions involve claimants who appeared pro se.  Plaintiffs have not
     described how the demographics of claimants represented by the law firms in question compare with the
     demographics of claimants concerning whom ALJ Sloan issued decisions during the time period at issue,

21   have not identified the other nine law firms involved, and have not indicated what portion of the 84
     decisions concern clients of Schroeter, Goldmark & Bender; plaintiffs' attorney has merely stated that, to

22   the best of his knowledge, the 84 decisions at issue represent all rulings by ALJ Sloan received by the law
     firms in question during the time period described.  AR (Seibel) 392; AR (Phelps) 333.

23

ORDER - 7

1    fails.[9]  To the extent that the items plaintiffs contend should be included in the

2    administrative records concern claimants other than plaintiffs,[10] such documents are not

3    "evidence," and plaintiffs' request to add such materials to the administrative records is

4    DENIED.

5

6    _____

7    [9] In his September 2013 letters to the Appeals Council, plaintiffs' attorney indicated that, during the period from September 29, 2012, to June 28, 2013, ALJ Sloan issued 283 decisions, 79 of which (or

8    27.9%) were favorable.  AR (Seibel) 391; AR (Phelps) 332.  During the same timeframe, the median rate of favorable decisions (reversals) among the 1,336 ALJs nationwide, who each issued more than 200 rulings in such period, was 54.95%.  AR (Seibel) 392; AR (Phelps) 333.  This comparison does not

9    establish bias, but rather might simply reflect that determinations made initially and/or on reconsideration in this region are of higher quality than elsewhere in the nation, leading to a lower reversal rate on the part of ALJ Sloan and her peers in Seattle.  _See_ _Yost_, 2016 WL 2989957 at *3; _see also_ _Cope_, 2016 WL

10   6439940 at *10; _Smith_, 2016 U.S. LEXIS 144401 at n.5.  Of the 84 decisions by ALJ Sloan that were proffered to the Appeals Council, which are from a slightly broader range of dates (September 27, 2012, to July 2013), apparently 20 (or 23.8%) were favorable.  _See_ AR (Seibel) 394-95; AR (Phelps) 335-36.

11   According to plaintiffs' counsel, 44 of the 84 decisions explicitly referred to DSHS, and 40 of the 84 decisions mentioned GAF.  _Id._  Plaintiffs' lawyer argues that the lower rates of reversal among the decisions containing the acronyms DSHS (4 of 44, or 9.1%) and GAF (2 of 40, or 5%) reflect a prejudice

12   on the part of ALJ Sloan against the poor and the mentally ill.  _See id._  Plaintiffs' counsel has not, however, provided enough information about the comparator decisions (in which the acronyms DSHS and GAF do not appear) and has not offered statistically significant sample sizes and variations to support his

13   accusation of bias.  _See_ _Smith_, 2016 U.S. LEXIS 144401 at n.5; _Yost_, 2016 WL 2989957 at *3-*4; _see also_ _Cope_, 2016 WL 6439940 at *9 (noting that "ALJ bias cannot be proven by statistical analysis, but

14   rather any ALJ's alleged bias must be judged on a case by case basis," and ruling that, even if "statistical evidence is _at all_ relevant to the issue of ALJ bias, it is clear that plaintiff has not demonstrated that his

15   sample is random, unbiased and statistically significant" (emphasis in original)).

16   [10] Attorney Anne Kysar, who represented Phelps when the matter was before ALJ Sloan, submitted a declaration to the Appeals Council, in which she recounted an exchange with ALJ Sloan that was not on

17   the record.  _See_ AR (Phelps) 330.  According to Kysar, Phelps encountered difficulty parking her vehicle and was a few minutes late to the hearing before ALJ Sloan.  _Id._  ALJ Sloan allegedly threatened Kysar,

18   in a "loud and angry voice," that she "had '30 seconds to get [her] client into the hearing room' or [ALJ Sloan] would dismiss [her] client's case."  _Id._  When the hearing commenced, ALJ Sloan inquired

19   of Phelps why she had been late.  AR 33.  After listening to the explanation, ALJ Sloan indicated that she expected, when she set a hearing, to start "at a certain time," and that she found Phelps's tardiness "to be

20   very disrespectful."  AR 34.  ALJ Sloan further explained that her time was limited and that, because the hearing was starting late, it would be "shortened as a result."  _Id._  The Court does not view ALJ Sloan's

21   expression of "impatience, dissatisfaction, annoyance, [or] even anger" about Phelps's lack of punctuality as being "so extreme as to display clear inability to render fair judgment" or as evidence of bias.  _See_

22   _Rollins v. Massanari_, 261 F.3d 853, 858 (9th Cir. 2001) (quoting _Liteky v. United States_, 510 U.S. 540, 551, 555-56 (1994)).  Moreover, having thoroughly reviewed the transcript of the hearing, the Court sees no basis to question ALJ Sloan's impartiality.

23

**B.**   **DSHS Benefits**

Plaintiffs contend that ALJ Sloan erred in not explaining why she ignored each plaintiff's receipt of DSHS benefits, citing to Social Security Ruling 06-03p,[11] which reads in relevant part:

> [F]inal responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner.  However, we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies.  Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered. . . .  Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies.  In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.  However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.

SSR 06-03p (citations omitted).  The administrative records, however, contain no reliable evidence of either an award of benefits or a determination of disability by DSHS.  Rather, the materials plaintiffs have cited consist of (i) Interim Assistance Reimbursement Authorizations executed by each plaintiff, AR (Seibel) 208; AR (Phelps) 246, which would permit the Social Security Administration to send to the State of Washington

---

[11] "Social Security Rulings constitute the Social Security Administration's interpretations of the statute it administers and of its own regulations."  *Chavez v. Astrue*, 699 F. Supp. 2d 1125, 1135 n.8 (C.D. Cal. 2009) (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Ukolov v. Barnhart*, 420 F.3d 1002, 1005 n.2 (9th Cir. 2005)).  Although they do not have "the force of law," after Social Security Rulings are published, they are binding on ALJs and the Commissioner.  *Id.* (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001); *Gatliff v. Comm'r of Soc. Sec. Admin.*, 172 F.3d 690, 692 n.2 (9th Cir. 1999); *Chavez v. Dep't of Health & Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996)).

either the first retroactive payment of SSI benefits, if awarded, or an amount equal to the

reimbursable public assistance received from the State of Washington, if any; (ii) an

Intake Summary from Community Psychiatric Clinic dated September 13, 2010,

indicating that Seibel was receiving $339 in General Assistance - Unemployable

("GAU") benefits, AR (Seibel) 637; and (iii) Community Health Center of Snohomish

County clinician notes dated February 27, 2013, reflecting that Phelps telephonically

reported "she is still waiting to see if DSHS approves re-establishing her benefits,"

AR (Phelps) 825.  None of these documents establish that Seibel or Phelps had been

declared "disabled" by DSHS.[12]  Thus, ALJ Sloan's silence regarding plaintiffs' alleged

receipt of DSHS benefits did not amount to error.

## C.   **Claimant Credibility**

In the absence of affirmative evidence showing that a claimant is malingering,

an ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

*Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  The Ninth Circuit has warned that

general findings concerning a claimant's credibility are insufficient; rather, an ALJ "must

identify what testimony is not credible and what evidence undermines the claimant's

complaints."  *Id.*  With respect to each plaintiff, ALJ Sloan found that the "medically

---

[12] Even if Seibel was getting GAU benefits, such fact would not demonstrate a DSHS determination of "disability."  Under the GAU program, which was in effect until 2010, an individual could receive benefits if he or she was merely "incapacitated," meaning he or she could not be gainfully employed as a result of a physical or mental impairment that was expected to continue for only 90 or more days (as opposed to the twelve or more months required under the Social Security Act to establish "disability").  *See* WAC 388-448-0001 (2009); *compare* 42 U.S.C. §§ 416(i)(1) & 1382c(a)(3).  GAU benefits could continue if the recipient demonstrated "no material improvement" in his or her "medical or mental condition."  *See* RCW 74.04.005(6)(g) (2009).  Thus, the cited reference to GAU benefits does not support plaintiffs' assignment of error.

determinable impairments could reasonably be expected to cause the alleged symptoms," AR (Seibel) 17, or at least "some of the alleged symptoms," AR (Phelps) 18, but that each plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." AR (Seibel) 17; AR (Phelps) 18.

### 1.   Seibel's Credibility

Seibel asserts that ALJ Sloan's credibility determination was improperly based on her misreading of the portions of the record she cited and/or on negative inferences improperly drawn from his psychotic symptoms. The Court disagrees. Contrary to Seibel's contention, ALJ Sloan did not conflate the implausibility of his statements, for example, about having worms in his body or seeing people move through solid objects, with a lack of candor. Rather, ALJ Sloan identified a persistent pattern, on Seibel's part, of changing the narrative.

In September 2009, Seibel told a treatment provider that he believed his gastrointestinal symptoms stemmed from a parasite, perhaps a tapeworm, with which he had become infected as a child. AR 538. Tests performed on a stool culture, however, were negative for bacteria, ova, cysts, or parasites. AR 545. In June 2010, Seibel informed a different practitioner that his gastrointestinal problems were related to stress, and although he mentioned hearing voices for the previous year, he denied having any visual hallucinations and did not mention worms. AR 566-67. Less than one month later, in July 2010, Seibel reported to yet another provider, this time a psychiatrist, that he had been hearing voices since elementary school age, that he had a sensation of worms in his body, and that he had been seeing worms in other people for the past year. AR 591.

1    Seibel also informed the psychiatrist that he had improved while on ziprasidone, also

2    known as Geodon, which had been prescribed by his primary care physician, *see supra*

3    note 3, and that he was able to "enjoy his artistic pursuits as much as ever."  AR 593.  In

4    September 2010, Seibel told a clinician, for purposes of an intake summary, that his

5    auditory hallucinations began only six months earlier.  AR 635.

6          In May 2011, Seibel reported that, since increasing to 80 mg of Geodon twice a

7    day, he had had no auditory hallucinations, AR 787, and in June 2012, he told a DSHS

8    evaluator that he would not be able to function without Geodon, AR 816, but eight

9    months later, in February 2013, Seibel informed a treating nurse practitioner that he had

10   ceased using Geodon, was "psychosis free," and did not want to take the medication in

11   the future, AR 866.  At the hearing before ALJ Sloan, on May 1, 2013, Seibel testified

12   that he was not taking any "pharmaceutical medications," AR 44, but he was continuing

13   to ingest and smoke marijuana on a regular basis, and that Geodon "basically took [his]

14   life away," making him unable to socialize or play music, AR 57.

15         In addition to making inconsistent statements concerning the onset of symptoms

16   and the efficacy of prescribed drugs, Seibel has been unreliable regarding the reason he

17   left his most recent job.  In August 2009, Seibel informed a social worker that he lost his

18   job as a result of "physical limitations."  AR 515.  In June 2010, the explanation given

19   was stress due to his symptoms of hearing voices and sleeplessness.  AR 566.  In

20   September 2010, Seibel stated that he quit his job as a kitchen manager at a jazz club

21   because he "couldn't hold a knife," AR 637, and/or because his fear and delusions caused

22   him to shake, AR 639.  In November 2010, Seibel disclosed to a consulting psychiatrist,

23

1   Michael Stanger, M.D., that he had been laid off from his job as a cook at Egan's Ballard

2   Jam House (a jazz venue and restaurant) because of "excessive absences," which he

3   attributed to "back pain."  AR 649.  Seibel also told Dr. Stanger that, in the previous year,

4   he had sought work, being paid occasionally for walking dogs, but receiving no call

5   backs for dishwashing jobs.  AR 648.  ALJ Sloan appropriately drew from these last few

6   statements to Dr. Stanger the conclusion that Seibel believed he could work.  AR 18.

7       Dr. Stanger rated Seibel's ability to perform work-related activities on a regular

8   and consistent basis as "fair."  AR 651.  Dr. Stanger believed Seibel was able to manage

9   his own funds, complete basic calculations, make change, perform simple and repetitive

10  tasks, interact reciprocally, and accept instructions from supervisors.[13]  AR 652.  With

11  regard to complex tasks and interacting with coworkers and the public, Dr. Stanger

12  assessed Seibel as having limitations; he was unable to calculate 6 x 7 or the number of

13  nickels in $1.35, and during interactions, he was "largely passive with a slightly slowed

14  rate of response," which might pose difficulties in maintaining the pace of work with

15  others.  AR 650, 652.

16

17  _____

18  [13] During his examination of Seibel in November 2010, Dr. Stanger observed linear, goal-oriented, and logical thinking, good vocabulary (Seibel having properly used the word "mendicant" in a sentence), direct and focused responses to questions, without tangentiality, circumstantiality, distractability, or

19  evasiveness, and no evidence of blocking, looseness of associations, or flight of ideas.  AR 650. Dr. Stanger also saw no evidence of delusional thought content, ideas of reference, or thought broadcasting.  *Id.*  Seibel was oriented as to place and time, could correctly restate a sequence of five

20  numbers both forward and backward, recalled three of three objects immediately and after five minutes, knew who was President (Obama), as well as the direction of Canada (north) and Spokane (east), was

21  able to spell "world" in reverse after correcting an initially misplaced "u," followed a three-step command without delay, appropriately interpreted the proverbs "don't cry over spilled milk" and "the early bird gets

22  the worm," could describe how apples and oranges were similar and different, and indicated that, upon finding a stamped envelope, he would put it in a mail box.  AR 650-51.

23

ORDER - 13

1    In June 2012, based on an examination performed for DSHS, Wayne C. Dees,

2 Psy.D. formed a similar opinion.[14]  Like Dr. Stanger, Dr. Dees concluded that Seibel can

3 perform simple and repetitive tasks, but might have difficulty with complex tasks and

4 interacting with others.  AR 817.  ALJ Sloan incorporated into the description of Seibel's

5 residual functional capacity the restrictions noted by Drs. Stanger and Dees, limiting

6 Seibel to simple tasks and some detailed tasks, and excluding tandem tasks, tasks

7 involving cooperative team effort, and tasks requiring contact with the general public.

8 *See* AR 16.

9    In light of Seibel's inconsistent statements about the onset of his symptoms, the

10 efficacy of medications, and the reason he lost his job, his evasiveness when asked by

11 ALJ Sloan about his marijuana use, *see* AR 50-54[15], and his performance on mental

12 status examinations, the Court is satisfied that ALJ Sloan has offered "clear and

13 convincing" reasons, supported by substantial evidence, for concluding that Seibel has

14 "exaggerated [his] symptoms and is more capable than he has alleged."  AR 19.

---

16 [14] Dr. Dees did not observe any symptoms of auditory or visual hallucinations.  AR 815.  He indicated that Seibel reported smoking about 4 grams of marijuana (cannabis) every day, but checked "no" with regard to observing symptoms of cannabis dependence.  AR 815, 817.  Seibel exhibited a normal rate, rhythm, and volume of speech, as well as logical, linear, and goal-oriented thought processes.  AR 818. He was oriented as to time and place, was able to learn three of three objects in one trial and recall all three objects after five minutes, "suggesting an unimpaired ability to learn," could name the current and four previous presidents, the capital of Washington, and the bordering states, completed five serial 3s with no error (97, 94, 91, 88, 85), correctly spelled "world" forward and backward, was able to complete both simple and complex instructions, described how an apple and a banana are alike and how a table and a chair are similar, was able to interpret the proverb "you can't judge a book by its cover," but not the saying "people who live in glass houses shouldn't throw stones," and provided appropriate answers to questions about what he would do if he saw smoke or fire in a crowded theatre or found a stamped, sealed, and addressed envelope on the ground.  AR 818-19.

[15] Although Seibel's reluctance to answer questions about who supplied him with marijuana might be explained by a desire to avoid getting his friends into trouble, the same cannot be said of his refusal to quantify the amount of marijuana he ingested or smoked each day.

1      **2.      Phelps's Credibility**

2           Phelps makes an analytically different argument than Seibel.  She contends that

3      ALJ Sloan failed to explain which of Phelps's alleged symptoms could reasonably be

4      expected to be caused by her medically determinable impairments and which could not,

5      making review of ALJ Sloan's credibility determination impossible.  Phelps's assertion

6      lacks merit.  ALJ Sloan provided three reasons for why Phelps's allegations of disabling

7      functional limitations were not entirely credible:  (i) her independent daily activities and

8      social interactions were not consistent with her claims; (ii) the medical evidence did not

9      substantiate her complaints; and (iii) her problems appeared, at least in part, situational in

10     nature, rather than stemming from medically determinable impairments.  *See* AR 18-20.

11     With respect to each of these grounds, ALJ Sloan offered details that made clear which

12     symptoms were viewed as being less intense, persistent, or limiting than Phelps contends.

13          **a.      Back Pain**

14          For example, Phelps has indicated that, as a result of a back injury for which she

15     filed a Labor and Industries ("L&I") claim in January 2010,[16] she is unable to sit or stand

16     for more than about 20 minutes at a time or to bend over to pick up items.  *See* AR 39-40.

17     ALJ Sloan noted, however, that in May 2011, Phelps told a treatment provider that she

18     

19     [16] In October 2010, when Phelps underwent an independent medical examination ("IME") related to the
L&I claim, Phelps stated that she believed her low back pain resulted from strenuous activities (lifting,
bending, and twisting) performed while working for Fred Meyer; however, chart notes indicated that the
20     employer thought the back problem was preexisting, perhaps caused by a motor vehicle accident in 2001.
AR 657-59.  Although Phelps had been released to return to full duty and discharged from physical
therapy in August 2010, she reported during the IME that she did not go back to work because she had
21     been fired by Fred Meyer.  AR 658-59.  Based on the results of his examination, Melvin Levine, M.D.
concluded that Phelps was capable of working without restriction and was approved for "any and all
22     jobs."  AR 663-64.  Dr. Levine further opined that the abnormalities noted on Phelps's MRI study in
March 2010 were likely not the result of her work at Fred Meyer.  AR 664.

23

ORDER - 15

had "no problem" with step aerobics classes, which she attended twice a week.  AR 17; *see* AR 695; *see also* AR 46.  Moreover, in July 2011, Phelps sought medical attention for swelling in her hands associated with a visit to a batting cage, and in August 2012, she complained of bilateral arm pain related to playing in a pool and shooting basketballs; on each occasion, she did not report any issues with her back.  *See* AR 705-07, 866-67.  At the hearing before ALJ Sloan in May 2013, Phelps indicated that she exercises roughly twice a week, using a work-out video, which involves power walking and leg lifts.  AR 45.  The record supports ALJ Sloan's conclusion that Phelps's allegation of disabling back pain is not consistent with her level of activity.[17]

Moreover, as noted by ALJ Sloan, the objective medical evidence does not support a finding that Phelps's back problem changed significantly on or near the alleged disability onset date of June 1, 2012.  In July 2012, Phelps told a treatment provider, Douglas McMillen, M.D., that she was having mid-back pain, which was aggravated by

_____

[17] Subsequent to the development of back problems while working for Fred Meyer, Phelps attended Shoreline Community College, earning a 3.15 grade point average over a two-year period.  *See* AR 326-27.  Phelps was enrolled full-time from the fall quarter of 2010 through the summer quarter of 2012.  *Id.* She had difficulty completing courses during the summers, taking hardship withdrawals from elementary algebra and Word 2010, Level 1 in the summer of 2011 (but receiving a 3.0 in Word 2010, Level 1 during the following quarter and a 3.7 in Word 2010, Level 2 in the spring of 2012), and withdrawing from two courses in the summer of 2012.  *Id.* Phelps apparently did not register for classes thereafter.  AR 327. Notably, however, in the spring of 2011, she took a two-credit step aerobics class for which she achieved a grade of 3.9.  AR 326.  In assessing whether Phelps is "disabled," ALJ Sloan appropriately considered Phelps's performance in school during the two years immediately preceding the alleged disability onset date of June 1, 2012, but ALJ Sloan incorrectly interpreted Phelps's testimony about why she ceased attending school.  According to ALJ Sloan, Phelps stated at the May 2013 hearing that she was unable to return to school until she repaid a student loan.  AR 20; *see also* AR 21.  Phelps described the reverse correlation; she owes on the student loan because she stopped going to school, not the other way around. *See* AR 37-38.  The Court concludes that ALJ Sloan's misinterpretation of Phelps's testimony, pursuant to which she found Phelps's reason for dropping out of community college to be financial or situational in nature, rather than disability based, is harmless error in light of the other "clear and convincing" reasons ALJ Sloan gave for discounting many of Phelps's complaints.

ORDER - 16

1    extension, but relieved by stretching.  AR 868.  A physical examination of the spine was

2    negative for posterior tenderness, AR 869, and an X-ray showed only mild spondylotic

3    change in the thoracic spine and mild anterior vertebral body height loss at T9, which was

4    similar to results seen in March 2012, AR 872.  In September 2012, Phelps again

5    complained to Dr. McMillen of back pain, indicating that it had begun within the

6    previous two weeks.  AR 864.  In both July and September 2012, Dr. McMillen opined

7    that Phelps's pain was likely muscular in nature, and at the latter visit, he prescribed

8    Flexeril, a muscle relaxant, and suggested increasing the dosage of ibuprofen, an anti-

9    inflammatory, to 600 mg three times per day.  AR 865, 869.

10          In December 2012, Phelps described symptoms of neuropathy, but she showed a

11   normal range of motion, muscle strength, and stability in all extremities with no pain on

12   inspection.  AR 848, 851.  On January 10, 2013, Phelps complained of musculoskeletal

13   pain, which she indicated had begun three weeks before, but the treatment provider saw

14   no signs of sciatica, no edema, no joint deformity, heat, swelling, erythema, or effusion in

15   either hip, no tenderness in the lumbar spine, and a full range of motion.  AR 835-37,

16   839-42.  A course of meloxicam, an anti-inflammatory, was prescribed, and Phelps was

17   advised to perform stretching exercises.  AR 842.  She subsequently failed to show up for

18   a physical therapy appointment, AR 838, and does not appear to have rescheduled the

19   appointment or further pursued a course of physical therapy.

20          On January 29, 2013, Phelps again indicated that she had lower back pain, which

21   she stated had onset during the previous week, but a physical examination revealed

22   pain-free full rotation of the lumbar spine, no restriction on flexion, extension, or lateral

23

1  bending, and normal ranges of motion in both hips (120° flexion, 30° extension, 45°

2  abduction, 30° adduction, 45° external rotation, and 45° internal rotation).  AR 831-33.

3  Robaxin (methocarbamol), another muscle relaxant, was added to the list of Phelps's

4  medications.  AR 834.

5      On February 22, 2013, Phelps sought the completion of "DSHS paperwork."  In

6  doing so, Phelps reported that her low back symptoms "began 49 months ago," which

7  would have been sometime in January 2009.  AR 827.  The January 2009 onset date was

8  inconsistent with Phelps's statement to Dr. Levine, during the 2010 IME, that since

9  recovering from the 2001 motor vehicle accident, she had no back problems until she was

10  injured in late January 2010 while working at Fred Meyer.  _See_ AR 659.  Scott McAfee,

11  M.D. complied with Phelps's request and filled out a DSHS check-box form, opining that

12  Phelps would be severely limited, _i.e._, unable to meet the demands of even sedentary

13  work, for the next 99 months, as a result of degenerative disc disease of the lumbar spine

14  and bilateral carpal tunnel syndrome.  AR 813-14.  Yet, in May 2013, when Dr. McAfee

15  again examined Phelps, he observed her to have no edema and to have a normal range of

16  motion, muscle strength, and stability in all extremities with no pain on inspection.

17  AR 876.  The Court is satisfied that ALJ Sloan appropriately relied on both Phelps's

18  activity level and the absence of medical evidence to substantiate her subjective claims as

19  "clear and convincing" reasons to doubt the severity of her back issues.

20          **b.    <u>Carpal Tunnel Syndrome</u>**

21      Phelps has also complained of difficulty grasping or holding things with her hands

22  and of dropping items without intending to do so, as a result of carpal tunnel syndrome

23

1 ("CTS"), AR 41-42; however, during the period from the alleged disability onset date of

2 June 1, 2012, to the month of the hearing before ALJ Sloan, May 2013, Phelps did not

3 seek any medical attention for CTS symptoms.  In this time frame, Phelps complained of

4 arm pain, once after playing in the pool and shooting basketballs, AR 866, a few months

5 later, describing numbness in her arms and legs bilaterally, AR 848, and in April 2013,

6 indicating that she was experiencing pain in her hands and thumbs, bilaterally, radiating

7 to the shoulder, AR 817, but these symptoms are unrelated to carpal tunnel syndrome.  A

8 nerve conduction and electromyography ("EMG") study performed in May 2013 revealed

9 that Phelps has only mild carpal tunnel syndrome of the right wrist.  AR 882.  The record

10 simply does not support Phelps's apparent assertions that she has carpal tunnel syndrome

11 in both wrists or that carpal tunnel syndrome renders her unable to perform even light or

12 sedentary work, and ALJ Sloan aptly concluded that Phelps can "frequently handle and

13 finger bilaterally," AR 18.

14         **c.**      **Depression, Anxiety, and Cognitive Difficulties**

15       The record reflects that Phelps participated in special education classes in

16 elementary and high school, suffered bacterial meningitis in 2003, which Phelps claims

17 lead to some issues with memory and/or cognition, and has been on prescription

18 medications for depression and anxiety since before the alleged disability onset date of

19 June 1, 2012.  AR 428, 466, & 570; _see_ AR 571 (indicating that, in 2008, Phelps was

20 taking both Celexa (citalopram), a selective serotonin reuptake inhibitor, and Wellbutrin

21 (bupropion), an antidepressant); _see also_ AR 870 (stating that Phelps began taking

22 citalopram in May 2012).  Phelps alleges that she has difficulty focusing and completing

23

1  tasks, lacks energy or interest in doing anything, does not sleep well at night and then

2  stays in bed until the afternoon, sometimes doesn't eat or bathe, and experiences

3  drowsiness as a side effect of medications that she is taking.  *See* AR 43-44, 47-48, 288,

4  311-12, 318.  As ALJ Sloan observed, the record does not support the extent to which

5  Phelps claims she is impaired.

6         In August 2008, Phelps sought disability benefits after being bitten by a dog in

7  April 2008, while working as a plant care provider.  *See* AR 70, 465.  In connection with

8  such application, Phelps was evaluated by psychologist Rodger I. Meinz, Ph.D.  Ex. 7F.

9  In September 2008, roughly five years after Phelps's bout of meningitis, Dr. Meinz

10  administered the third edition of the Wechsler Adult Intelligence Scale ("WAIS-III"), and

11  measured Phelps's Full Scale IQ as 95, which is well within the average range.  AR 468.

12  Based on the WAIS-III score, the results of a mental status examination,[18] and other

13  information acquired during his evaluation, Dr. Meinz opined that Phelps would be able

14  to return to work if she so desired.  AR 470.  Dr. Meinz expressed concern that some of

15  Phelps's complaints about depression and anxiety "might be related to litigation gains,"

16

17  _____

   [18] Phelps's speech production was normal, her expressed thoughts were adequately formulated and
18  articulated, and were absent of delusional material, and she was never tangential or circumstantial.
   AR 467.  Phelps manifested no evidence of anxiety or depression, she was never tearful, her affective
19  range was full and appropriate, and she appeared "quite emotionally stable."  *Id.*  She was oriented to
   person, place, and time, knew why she was at Dr. Meinz's office, denied hallucinatory episodes, and
20  showed no sign that she might be responding to bizarre internal stimuli.  *Id.*  Phelps was able to recall
   three of three objects after five minutes, recalled five digits forward, but only three digits backward,
21  completed serial 3s from 20 (17, 14, 11, 8, 5, 2), spelled "world" forward and backward, knew who was
   President (Bush) and which states bordered Washington (Idaho and Oregon), but mistakenly thought
22  Maria Cantwell was governor, indicated that she had never heard the proverb "strike while the iron is
   hot," and stated that, if she smelled smoke in a crowded theater, but it did not grow worse, she would
   probably just continue to watch the movie.  AR 468.  Phelps scored in the 90th percentile on one trail-
   making test and in the 50th percentile on a second one.  *Id.*

23

and believed that "some exaggeration [was] at play in her complaints."  AR 469.  He observed Phelps to be "fairly upbeat" and to have "plenty of energy across a three-hour session that occurred late in the day."  AR 467, 469.  He saw no signs of depression or anxiety and no evidence of any problem with comprehension.  *Id.*  According to Dr. Meinz, Phelps had "no difficulty sustaining her concentration and attention to fairly complex cognitive tests throughout a two-hour period."  AR 469.

During the months preceding the alleged disability onset date of June 1, 2012, Phelps was seen by various providers at Community Health Center of Snohomish County.  Ex. 20F.  On February 29, 2012, Diane Carol White, M.D. renewed Phelps's prescription for Celexa, and noted that Phelps had been "successfully treated" with the medication, but needed a refill and wanted a counselor, was not suicidal, and was in no acute distress.  AR 744-45.  On April 4, 2012, Phelps complained about headaches to Joyce Nuesca, M.D., and was observed to have an appropriate mood, a normal affect, no sadness or nervousness, and no suicidal or homicidal ideation.  AR 737-38.  Two weeks later, on April 18, 2012, Phelps reported to Lakeysha Taylor, M.D. that her headaches had subsided without using the Imitrex (sumatriptan) dispensed by Dr. Nuesca, and Dr. Taylor described Phelps's depression symptoms as "stable."  AR 735; *see* AR 738.  Chart notes from May 10, 2012, again reflect an appropriate mood, a normal affect, no sadness or nervousness, and no suicidal or homicidal ideation.  AR 734.

On the previous day, however, May 9, 2012, Phelps told a therapist that she had no energy, that she had suffered a nervous breakdown before ending a bad relationship with a recovering methamphetamine addict, and that she was having uncontrollable

1   visions of falling off her balcony.  AR 770.  A mental status examination revealed that

2   Phelps was oriented to person, place, and time, had a normal rate and rhythm of speech,

3   exhibited logical and connected thought processes, had a normal affect, could recall three

4   words after five minutes and where she was last Christmas, although not where she was

5   the previous Tuesday, denied having hallucinations, obsessions, or compulsions, but

6   endorsed ruminating and feeling self-conscious, occasionally to the point of paranoia, had

7   unimpaired attention, and described her mood as "mixed," _i.e._, "down, but happy in some

8   ways."  AR 770-71.  At the time, Phelps was residing with her father, who she believed

9   was manipulative and controlling.  AR 771.  The therapist observed that, despite the

10  challenges of a hurtful long-term relationship that exacerbated "feelings of helplessness

11  and low self-esteem learned in childhood," Phelps was able to graduate high school,

12  maintain employment until 2010, and recently return to school.  AR 772.  A few days

13  later, Wayne Bentham, M.D., after consulting with the therapist, but without examining

14  Phelps, increased her dosage of citalopram to 40 grams per day, and prescribed prazosin

15  and Ambien, which are used to treat insomnia.  AR 768-69.  By May 23, 2012, Phelps

16  reported that the new medications were helping her to stay asleep once she fell asleep.

17  AR 765.

18          On November 7, 2012, Phelps began seeing a different therapist.  Phelps told the

19  new therapist that she was better than she had been and that, although she felt the

20  depression was getting worse, the medications were working.  AR 858.  At the time,

21  Phelps was staying with her sister, but needed to move out so that her sister did not lose

22  her lease; she was working with the Housing and Essential Needs ("HEN") program to

23

1   find a place to live.  *Id.*  A week later, on November 14, 2012, Phelps was observed to

2   have a "blunted" affect, was tearful at times, had somewhat slowed speech, and appeared

3   distracted and unengaged in the appointment.  AR 856.  In her notes, the therapist wrote

4   that Phelps's anxiety symptoms "seem to be largely related to her inability to find

5   housing [and] not knowing where she is going to be staying from one day to the next."

6   *Id.*  By November 28, 2012, Phelps had moved in with her uncle, and reported that she

7   had "much less anxiety now that her housing situation is 'under control.'"  AR 853-54.

8   Phelps indicated that she got along well with her uncle and felt safe in his home, even

9   though it was "far away from things."  AR 854.  The therapist described Phelps's affect

10  as "less depressed and anxious than previously seen," noting that Phelps smiled

11  occasionally throughout the appointment.  AR 853.

12      On January 9, 2013, Phelps reported that she was still living with her uncle and

13  that "things are better."  AR 843.  She complained of recent flashbacks related to her

14  prior long-term relationship, stating that she was frustrated about not being able to get

15  over it.  *Id.*  The therapist viewed Phelps's thought processes as logical, her reasoning,

16  impulse control, and judgment as fair, but her self-perception as critical and her insight as

17  poor, her mood as depressed, and her affect as incongruent, for example, smiling when

18  discussing her partner's infidelity.  *Id.*  Phelps failed to show up on January 23, 2013, for

19  her next appointment, AR 838, and had only two more interactions with the therapist, one

20  by telephone on February 27, 2013, in which Phelps expressed frustration at dealing with

21  DSHS, AR 825, and the other in person on April 5, 2013, AR 823-24.  During this last

22  visit, the therapist observed Phelps's reasoning and judgment to be good, her insight to be

23

1  fair, her self-perception to be abasing, her affect to be full range, and her mood to be

2  euthymic (normal, non-depressed), AR 823, all of which were improvements over her

3  status in early January 2013.  According to the therapist's notes, sometime before the

4  April 2013 appointment, Phelps had become eligible to seek treatment through Compass

5  Health, which had locations closer to her uncle's home.  AR 823.  Although Phelps

6  voiced an intent to pursue future therapy services through Compass Health, *id.*, she did

7  not do so, and Compass Health has indicated that a search revealed no records for Phelps,

8  *see* AR 795.

9          Contrary to Phelps's allegations, the medical evidence shows that Phelps has no

10  cognitive impairment, and ALJ Sloan appropriately concluded that Phelps is able to

11  "understand, remember, and carry out simple, detailed, and complex tasks."  AR 18.  The

12  record also reflects that Phelps's depression improved with medication and her anxiety

13  diminished after she secured housing with her uncle.  In addition, one examiner opined

14  that Phelps exaggerated her symptoms of depression and anxiety.  The Court is satisfied

15  that ALJ Sloan provided "clear and convincing" reasons for disbelieving most of Phelps's

16  claims about the impact of her depression and anxiety,[19] and that Phelps's social

17  interaction limitations were adequately addressed by including in the summary of her

18  _____

19  [19] ALJ Sloan relied, in part, on Phelps's disclosure to a nutritionist that she was not exercising because
    she is "very lazy."  AR 20; *see* AR 870.  Phelps also told the nutritionist, however, that she had tried

20  working out at the gym, but doing so hurt her back, and that her depression contributed to her lack of
    motivation to exercise.  AR 870.  The Court does not draw from these treatment notes the same inference

21  as ALJ Sloan, namely that Phelps's inactivity in mid-2012 was the product of laziness, as opposed to her
    physical and/or mental condition, but such disagreement does not alter the result.  By May 2013, when

22  Phelps testified before ALJ Sloan, Phelps was apparently exercising on a regular basis, and such activity
    along with the medical evidence from mid-2012 forward amply supported ALJ Sloan's assessment of
    Phelps's credibility.

23

ORDER - 24

1  residual functional capacity a restriction against contact with the general public as an

2  essential element of any task.  *See id.*

3  **D.   Practitioners' Opinions**

4        In the social security context, the opinion of a treating physician is generally

5  entitled to more weight than the opinions of examining or non-examining (consulting)

6  practitioners.  *See Lester*, 81 F.3d at 830; *see also* 20 C.F.R. §§ 404.1527 & 416.927.

7  When a physician's opinion is not contradicted by another practitioner, it may be rejected

8  only for "clear and convincing" reasons.  *See Lester*, 81 F.3d at 830.  On the other hand,

9  in the event of disagreement among practitioners, a treating or examining physician's

10  opinion can be disregarded for "specific and legitimate" reasons supported by

11  "substantial evidence" in the record.  *Id.* at 830-31.

12        The "clear and convincing" and "specific and legitimate" standards apply to the

13  opinions of "acceptable medical sources."  *See id.* at 830 n.7; *see also* 20 C.F.R.

14  §§ 404.1527(a)(2) & 416.927(a)(2).  Only licensed physicians and certain qualified

15  specialists, including licensed or certified psychologists, are considered "acceptable

16  medical sources."  20 C.F.R. §§ 404.1513(a) & 416.913(a).  Other sources, like nurse

17  practitioners, physicians' assistants, therapists, educational personnel, and social welfare

18  agency personnel, *see* 20 C.F.R. §§ 404.1513(d) & 416.913(d), are not entitled to the

19  same deference as "acceptable medical sources," and their opinions may be discounted if

20  the ALJ "gives reasons germane to each witness for doing so."  *Molina v. Astrue*, 674

21  F.3d 1104, 1111 (9th Cir. 2012) (quoting *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217,

22  1224 (9th Cir. 2010) (quoting *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001))).

23

1          **1.      Opinions Regarding Anthony Seibel**

2                  **a.      "Other" Sources**

3          Seibel asserts that ALJ Sloan improperly discounted the opinions of three

4   practitioners who are not "acceptable medical sources."  Seibel's argument lacks merit.

5   In considering the opinions of those who are not "acceptable medical sources," an ALJ

6   may take into account the following factors:  (i) the length of the source's relationship

7   with the claimant and how frequently the source has seen the claimant; (ii) whether the

8   source's opinion is consistent with other evidence; (iii) the degree to which the source

9   presents relevant evidence to support an opinion; (iv) the quality of the source's

10  explanation of an opinion; (v) whether the source has expertise related to the claimant's

11  impairment; and (vi) any other factor tending to support or refute the opinion.  _See_

12  SSR 06-03p (2006 WL 2329939 at *4-*5).

13         Charles Larsen-Kalla, L.M.H.C. completed a DSHS check-box evaluation form in

14  August 2010 based on records at Harborview Medical Center and the treatment notes of

15  Christos S. Dagadakis, M.D., the psychiatrist Seibel saw in July 2010.  _See_ AR 707; _see_

16  _also_ AR 591-95.  Counselor Larsen-Kalla opined that Seibel was severely limited in the

17  ability to learn new tasks and markedly limited in the ability to perform routine tasks.

18  AR 712.  These assessments are contradicted by the results of the mental status

19  examinations performed by Drs. Stanger and Dees.  Counselor Larsen-Kalla also

20  concluded that Seibel "is not able to work and would be a good candidate for social

21  security."  _Id._  ALJ Sloan assigned "no weight" to this opinion, observing that whether

22  Seibel can work is an issue reserved to the Commissioner, that Counselor Larsen-Kalla

23

1    relied heavily on Seibel's less than fully credible self report, and that, at the time the

2    DSHS form was completed, Counselor Larsen-Kalla's treatment relationship with Seibel

3    was relatively new.  AR 20.  The Court is persuaded that ALJ Sloan provided germane

4    reasons consistent with the factors set forth in SSR 06-03p for discounting Counselor

5    Larsen-Kalla's opinion.

6         Mary Montgomery, A.R.N.P. performed a psychiatric evaluation interview of

7    Seibel in November 2010, and apparently completed, but did not sign, a DSHS check-box

8    evaluation form in July 2011.  ALJ Sloan assigned "little weight" to the interview notes

9    and "no weight" to the DSHS form.  AR 20, 22.  In her November 2010 interview notes,

10   Nurse Montgomery recounted the extensive history she took upon first meeting Seibel.

11   AR 629-32.  She observed Seibel to be alert, oriented, and cooperative, to be WNL

12   (within normal limits) with regard to speech, attire, grooming, hygiene, and "psycho-

13   motor," to display no extrapyramidal symptoms (side effects of antipsychotics), an

14   euthymic mood, logical thinking, and fair insight and judgment.  AR 632.  According to

15   her notes, Nurse Montgomery advised Seibel that his symptoms were "not supportive of

16   medical marijuana being prescribed."  _Id._  She also indicated that Seibel was unemployed

17   and "unable to work," _id._, but whether she had formed this opinion herself or was merely

18   repeating Seibel's assertion is unclear.

19        The July 2011 DSHS check-box form, which was not signed, indicated that Seibel

20   had marked impairment in the ability to learn new tasks, AR 806, which was inconsistent

21   with the results of mental status examinations by Drs. Stanger and Dees, and marked

22   impairment in the ability to communicate and perform effectively in a work setting with

23

public contact, AR 807, which was taken into account in assessing Seibel's residual

functional capacity.  The DSHS form further stated that "[m]ental health intervention will

hopefully improve patient's quality of life, but substantially improving his ability to work

for pay is imporable [sic]."  *Id.*

ALJ Sloan discounted Nurse Montgomery's November 2010 evaluation because

she issued it after seeing Seibel only once and it was based on Seibel's less than fully

credible self report.  AR 20-21.  ALJ Sloan disregarded the July 2011 DSHS form

because it was not signed, provided no observations or objective signs or findings in

support of the limitations outlined, offered no independent evaluation of how marijuana

use affected Seibel's symptoms, and relied heavily on Seibel's less than fully credible

subjective report.  AR 22-23.  The Court is satisfied that ALJ Sloan gave appropriate

weight to both the November 2010 interview notes and the unsigned July 2011 DSHS

check-box form.

Elaine Waller-Rose, L.I.C.S.W. authored a report based on 22 therapy sessions

with Seibel between October 4, 2011, and April 4, 2012.  AR 924-25.  ALJ Sloan gave

"minimal weight" to this undated report because no clinical notes of the 22 visits had

been kept, no diagnosis of cannabis dependence had been made and the extent to which

marijuana use affected Seibel was not discussed in the report, the information provided in

the report was "little more than a recitation of the claimant's less than fully credible

subjective complaints," and Seibel apparently stopped seeing this therapist after someone

told him that doing so might negatively affect his claim for DIB and SSI benefits.  *See*

1    AR 23-24.  These reasons are germane to this source, and they are consistent with the

2    factors set forth in SSR 06-03p.

3              **b.      Acceptable Medical Sources**

4              Seibel also contends that ALJ Sloan did not give proper weight to the opinions of

5    Drs. Roter, Stanger, and Dees.  The Court disagrees.  With respect to Dr. Roter, only one

6    sentence amongst almost a year's worth of treatment notes was assigned "little weight"

7    by ALJ Sloan, namely an indication that Seibel was "unable to work due to mental

8    instability, paranoia, auditory hallucinations, and awkwardness with people."  AR 20; _see_

9    AR 433.  ALJ Sloan appears to have considered and given greater weight to the balance

10   of Dr. Roter's observations and opinions, including his diagnosis of bipolar disorder.

11   Whether the statement about Seibel's inability to work was Dr. Roter's own assessment

12   or merely a recitation of Seibel's complaints is unclear from its context.  Even if it was

13   Dr. Roter's evaluation, however, the opinion would not be entitled to deference because

14   the question of whether Seibel can work is reserved to the Commissioner.  _See_ SSR 96-5p

15   (1996 WL 374183 at *5); 20 C.F.R. §§ 404.1527(d)(1) & 416.927(d)(1).[20]  Moreover, as

16

17   [20] This case is distinguishable from _Hill v. Astrue_, 698 F.3d 1153 (9th Cir. 2012), which was cited by
     plaintiffs' counsel.  In _Hill_, an examining psychologist opined that the claimant's "combination of mental
     and medical problems makes _the likelihood of sustained full time competitive employment unlikely_." _Id._
18   at 1159 (emphasis in original).  The ALJ in _Hill_ did not assign any degree of weight to the examining
     psychologist's opinion and gave no reason for doing so. _Id._ at 1160.  On appeal, the Commissioner
19   conceded the ALJ's error, but argued it was harmless because an opinion that an individual cannot work
     concerns an issue reserved to the Commissioner and is therefore not binding. _Id._  The Ninth Circuit
20   disagreed because the examining psychologist's statement was not conclusory, like those described in
     20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work'
21   does not mean that we will determine that you are disabled."), but was instead an assessment based on
     objective medical evidence regarding the claimant's _likelihood_ of being able to work full time.  _See_ 698
22   F.3d at 1160.  In contrast, in this case, Dr. Roter's notation was exactly the type of conclusory comment
     contemplated in 20 C.F.R. § 404.1527(d)(1), and ALJ Sloan did not ignore or fail to consider the remark,
     but rather explained why it was not given much weight.

23

ORDER - 29

1   indicated by ALJ Sloan, any conclusion by Dr. Roter concerning Seibel's inability to

2   work would have been based primarily on Seibel's less than fully credible self report.

3   Finally, the discounted remark at issue was written on January 20, 2010, weeks before

4   Seibel reported to Dr. Roter that Geodon was helping him ignore the voices and made

5   him more comfortable around people, several months before Seibel told Nurse

6   Montgomery that he no longer had paranoia, and years before he informed Nurse

7   Montgomery that he had ceased using Geodon and was psychosis free.  The Court is

8   convinced that "clear and convincing" reasons supported the "little weight" ALJ Sloan

9   gave to Dr. Roter's isolated note regarding Seibel's inability to work.

10        The Court is similarly persuaded that ALJ Sloan gave appropriate weight to the

11  opinions of Drs. Stanger and Dees.  Both examiners assessed Seibel as being able to

12  perform simple and repetitive tasks, but as potentially having difficulty with complex

13  tasks and interacting with others.  ALJ Sloan adopted these views in describing Seibel's

14  residual functional capacity.  ALJ Sloan assigned "less weight" to Dr. Stanger's recitation

15  of Seibel's history, including Seibel's report that he began hearing voices in elementary

16  school, his complaint of panic attacks lasting four to five hours occurring once or twice a

17  week, and his own assessment that "he has difficulty comprehending statement [sic] of

18  others as words are garbled."  _See_ AR 21; _see also_ AR 646-47, 652.  The Court is

19  satisfied that this portion of Dr. Stanger's report, which did not offer any medical

20  opinions and merely repeated Seibel's less than fully credible assertions, was not entitled

21

22

23

ORDER - 30

1    to any deference.[21]  Moreover, even if deference was owed, the inconsistent statements

2    cited by ALJ Sloan, indicating a more recent onset of auditory hallucinations and

3    cessation of panic attacks, and Dr. Stanger's observation that Seibel did not experience

4    during the evaluation the alleged difficulty in comprehension, *see* AR 652, constituted

5    substantial evidence supporting clear and convincing reasons for discounting the

6    segments at issue of Dr. Stanger's report.

7            Similarly, the Court is persuaded that ALJ Sloan appropriately gave "limited

8    weight" to Dr. Dees's opinion that Seibel was unlikely to "be able to work in a consistent

9    and competitive environment or show up for work on time" and that his psychotic

10   symptoms would "likely impair his ability to interact with others and maintain a

11   consistent work schedule." *See* AR 23; *see also* AR 817.  ALJ Sloan explained that

12   Dr. Dees's views were largely based on Seibel's less than fully credible self report and

13   were not well supported by his mental status examination.  ALJ Sloan provided the

14   requisite clear and convincing reasons supported by substantial evidence for disregarding

15   part of Dr. Dees's report.

16           Seibel further accuses ALJ Sloan of failing to incorporate into the description of

17   Seibel's residual functional capacity all of the limitations identified by Dan Donahue,

18   Ph.D. and Beth Fitterer, Ph.D., consultants for the Division of Disability Determination

19   Services, a state agency that, pursuant to federal regulations, makes initial assessments

---

[21] Seibel argues that ALJ Sloan improperly "cherry-picked" from Dr. Stanger's report the portions tending to establish he is not disabled.  Seibel cites no authority for the proposition that an ALJ cannot vary the weight given to each part of a medical source's opinion.  In addition, Seibel fails to explain why an ALJ should be required to accept without question a medical source's mere transcription of a claimant's oral history and subjective complaints.

1   concerning eligibility for DIB and SSI benefits and processes reconsideration requests.

2   Both Dr. Donahue and Dr. Fitterer assessed Seibel as able to maintain attention and

3   concentration for short, simple, and some detailed and/or multi-step instructions and

4   work-like procedures.  AR 92, 104, 121, 136.  They indicated that Seibel's ability to

5   sustain concentration, persistence, and pace is "likely to wane" in accordance with the

6   level of socialization required for a given employment setting.  _Id._[22]

7         Seibel asserts that ALJ Sloan's indication that he "should not perform tandem

8   tasks or tasks involving a cooperative team effort," AR 16, did not sufficiently reflect the

9   opinions of Drs. Donahue and Fitterer, and that ALJ Sloan was instead required to

10  incorporate a restriction against him working "in coordination with or _in proximity_ to"

11  others, as to which Drs. Donahue and Fitterer had assessed Seibel as being moderately

12  limited.  _See_ AR 92, 104, 121, 136 (emphasis added).  Seibel's contention fails to

13  acknowledge that the question on the forms completed by Drs. Donahue and Fitterer

14  asked in the alternative about working in coordination with others, as opposed to in

15  proximity to others, and Drs. Donahue and Fitterer elaborated that Seibel's concentration,

16  persistence, and pace was "likely to wane" in accordance with the level of socialization

17  required.  Contrary to Seibel's suggestion, Drs. Donahue and Fitterer were not precluding

18  him from working in proximity to others; rather, they opined that the more he had to

19

─────────────────────────

20  [22] Drs. Donahue and Fitterer further opined that, if Seibel ceased abusing substances, he would be able to interact with the public and co-workers on a frequent basis.  AR 92, 105, 121-22, 136-37.  They observed that Seibel's drug use was evidence of his moderately limited ability to be aware of normal hazards and

21  take appropriate precautions.  AR 93, 105, 122, 137.  They also concluded that Seibel might occasionally have difficulties adapting to changes in the work setting, but that he would nonetheless be able to do so within the normal tolerances of a competitive work environment.  _Id._

22

23

1  interact or socialize with others, the less effective he would be.  ALJ Sloan aptly

2  interpreted Drs. Donahue's and Fitterer's opinions, and her exclusion of "tasks involving

3  a cooperative team effort" adequately addressed Seibel's limitations.

4          2.      **Opinions Regarding Missy Phelps**

5          Phelps contends that ALJ Sloan erred in giving only "limited weight" to the

6  opinions of Holly Petaja, Ph.D., Jenna Yun, Ph.D., and Scott McAfee, M.D., all of whom

7  are "acceptable medical sources."  The Court disagrees.  Dr. Petaja indicated that Phelps

8  could follow short, simple directions and handle self-care independently, but that

9  depression affects Phelps's energy level, motivation, concentration, and ability to focus,

10  which could lead to errors, inability to complete work in a timely manner, communicate

11  effectively with others, perform routine tasks without supervision, adapt to changes in

12  routine, or follow complex instructions, and absenteeism.  AR 790.  Dr. Yun completed a

13  DSHS check-box form and rated Phelps moderately limited in the ability to understand,

14  remember, and persist in tasks by following very short and simple instructions, as well as

15  detailed instructions, to communicate and perform effectively in a work setting, to

16  complete a normal work day and work week without interruptions from psychologically

17  based symptoms, and to set realistic goals and plan independently.  AR 805.  Dr. Yun

18  opined that Phelps was otherwise not impaired and could perform activities within a

19  schedule, maintain regular, punctual attendance, learn new tasks, perform routine tasks

20  without special supervision, adapt to changes in routine, make simple work-related

21  decisions, ask simple questions and request assistance, be mindful of normal hazards and

22  take appropriate precautions, and behave in a manner suitable to the work setting.  *Id.*

23

ORDER - 33

1   Not only were Drs. Petaja's and Yun's opinions inconsistent with each other, they were

2   also contradicted by Phelps's performance on the WAIS-III and on various mental status

3   examinations, including one administered by Dr. Petaja.[23]   Moreover, both Dr. Petaja and

4   Dr. Yun appear to have relied unquestioningly on Phelps's complaints, which were not

5   fully credible.   ALJ Sloan provided the requisite "clear and convincing" and/or "specific

6   and legitimate" reasons for assigning "limited weight" to the opinions of Drs. Petaja and

7   Yun.[24]

8   _____

9   [23] On the mental status examination performed on July 18, 2012, Dr. Petaja observed Phelps's mood to be
10  euthymic and her affect to be mildly depressed.  AR 791.  Phelps's speech was normal in rate, rhythm,
    and volume, she was fully oriented to time, person, and situation, she could recall three of three words
11  immediately and after five minutes, could repeat six digits forward and three digits backward, and could
    name the current president and governor, as well as the bordering states, she spelled the word "world"
12  correctly forward and backward and completed serial 7s with no error (93, 86, 79, 72, 65), she interpreted
    the proverb "don't count your chickens before they hatch" as "don't expect more than what you have,"
    and the proverb "don't judge a book by its cover" as "don't judge what you first see; take your time to
13  look through it and find out what's really going on," she indicated that an orange and an apple are both
    fruit and that a fly and a tree are both outdoors, and she indicated that, if she smelled smoke in a crowded
    theater, she would think it could be a fire and would probably leave.  _Id._

14  [24] The Court notes that ALJ Sloan also discounted the unfavorable opinion of Lisa Hacker, M.D., a
    consultant for the Division of Disability Determination Services, who provided an assessment in
15  connection with the initial determination of ineligibility for DIB and SSI benefits.  _See_ AR 20; _see also_
    Exs. 6A & 7A.  Dr. Hacker opined that Phelps had no difficulty in maintaining social functioning.
16  AR 81, 90.  On reconsideration, Bruce Eather, Ph.D., another consultant for the Division of Disability
    Determination Services, concluded that Phelps has moderate difficulties in maintaining social functioning
17  and mild difficulties in maintaining concentration, persistence, or pace.  AR 101, 113.  Dr. Eather
    elaborated that Phelps has the ability to perform simple routine tasks, as well as complex and detailed
18  tasks, but that she should have only limited public contact.  AR 105-06, 117-18.  He further observed that
    recent medical evidence indicated Phelps had received medication and individual counseling for
19  depression, anxiety, and stress, and that Phelps's scores on the Patient Health Questionnaire, which
    attempts to quantify nine criteria for depression ("PHQ-9"), as well as on the Generalized Anxiety
    Disorder Seven-Item Scale ("GAD-7"), reflected a reduction in depression and anxiety in the preceding
20  months, rather than a worsening of symptoms as alleged by Phelps.  AR 106, 118; _see also_ Ex. 20F
    (showing a PHQ-9 score of 18/27 and a GAD-7 score of 20/21 in mid-May 2012, and much improved
21  scores of 5/27 and 12/27 on the PHQ-9 and 4/21 and 9/21 on the GAD-7 in late June and early July
    2012).  ALJ Sloan gave "significant evidentiary weight" to Dr. Eather's opinion, _see_ AR 20, and the
22  Court agrees with ALJ Sloan that Dr. Eather's views were consistent with Phelps's treatment history, as
    well as her WAIS-III and mental status examination results.  Phelps accuses ALJ Sloan of "cherry-
    picking" some and ignoring other medical evidence, citing to PHQ-9 and GAD-7 scores post-dating

23

1   With regard to the DSHS check-box form completed by Dr. McAfee in February

2   2013, indicating that Phelps would be severely limited, *i.e.*, unable to meet the demands

3   of even sedentary work, for the next 99 months, AR 814, the Court is likewise persuaded

4   that ALJ Sloan provided "clear and convincing" reasons for discounting the opinion.  As

5   observed by ALJ Sloan, Dr. McAfee's declaration of severe limitation was inconsistent

6   with his contemporaneous treatment notes and the relatively benign results of his range of

7   motion testing.  *See* AR 21; *see also* AR 815-16 (showing either a full or almost full

8   (within 5°–10° of normal) range of motion in twenty different areas, except for a 30° loss

9   in range of motion as to flexion of the back); AR 819-20, 836-37, 851, 876 (indicating in

10  December 2012, as well as in January, April, and May 2013, that Phelps had no edema

11  and had a normal range of motion, muscle strength, and stability in all extremities with

12  no pain on inspection).  ALJ Sloan astutely gave more weight to Dr. McAfee's treatment

13  notes and objective clinical findings than to the check-box form he completed at Phelps's

14  request.

15

16

---

17  Dr. Eather's assessment.  Phelps's argument is unpersuasive because the more recent PHQ-9 and GAD-7
    scores still indicated an overall lessening of symptoms, when compared with the scores from mid-May
18  2012, and the higher numbers between November 2012 and January 2013 were incongruous with
    Phelps's contemporaneous statements to treatment providers that she was better, AR 858, she was feeling
19  much less anxious, AR 853, and things were better, AR 843.  On May 16, 2013, Phelps told Dr. McAfee
    that she did not believe the prescribed medications were working and that her depression was getting
20  worse, but her GAD-7 score was 12/21, much lower than the year before, and Dr. McAfee assessed
    Phelps as having an appropriate mood and affect.  AR 873, 876.  Notably, although Phelps complained of
21  increased depression, Dr. McAfee did not record a PHQ-9 score, but he did start Phelps on a course of
    bupropion (Wellbutrin), AR 877, which she had been taking back in 2008.  At the time of the hearing
22  before ALJ Sloan on May 29, 2013, Phelps indicated that she had not been taking bupropion long enough
    to assess how it was working.  AR 43-44.  Phelps simply has not established that ALJ Sloan failed to
    consider relevant medical evidence.

23

ORDER - 35

1   **E.    Global Assessment of Functioning Scores**

2          Plaintiffs assert that ALJ Sloan improperly questioned the GAF scores assigned by

3   various practitioners.  The Court disagrees.  Global Assessment of Functioning, which

4   had been Axis V in a multi-axial system for assessing mental disorders, is no longer in

5   widespread use.  Am. Psychiatric Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF

6   MENTAL DISORDERS 16 (5th ed. 2013) ["DSM-5"].  The GAF scale had ranged from 0 to

7   100, with each 10-point increment having both a symptom severity and a functioning

8   component; a GAF rating would fall within particular decile (_e.g._, 1-10, 11-20, etc.) if

9   either the symptom severity or the level of functioning met the criteria.  Am. Psychiatric

10  Ass'n, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. (Text

11  Revision) 2000) ["DSM-IV-TR"]; _see id._ at 33 (indicating that, when an "individual's

12  symptom severity and level of functioning [were] discordant, the final GAF rating always

13  reflect[ed] the worse of the two").  The GAF methodology was considered "useful in

14  tracking the clinical progress of individuals in global terms, using a single measure" with

15  respect to "psychological, social, and occupational functioning," but not as to physical

16  impairments or environmental limitations.  DSM-IV-TR at 32.  The DSM-5 has moved

17  away from the axial diagnosis method and discarded the GAF scale because of "its

18  conceptual lack of clarity" and "questionable psychometrics in routine practice."  DSM-5

19  at 16.

20          In the wake of the DSM-5's publication, Administrative Message 13066 was

21  issued, indicating that GAF scores should continue to be treated as opinion evidence, but

22  also advising that the weight to be given to a GAF score depends on the rater's expertise

23

ORDER - 36

and familiarity with the claimant, the clarity of the rater's explanation for the GAF score,
the time period during which the GAF score applies, and whether the GAF score is
consistent with other evidence.  AM 13066 (effective July 22, 2013); _see Wynn v. Colvin_,
2015 WL 5569000 at *11 n.10 (W.D. Wash. Sep. 22, 2015) (observing that AM 13066 is
"an agency interpretation that does not impose judicially enforceable duties on either the
ALJ or this Court" (citing _Lockwood v. Comm'r Soc. Sec. Admin._, 616 F.3d 1068, 1073
(9th Cir. 2010))).  ALJ Sloan's grounds for discounting the various GAF scores were
consonant with Administrative Message 13066.

1.     **Seibel's GAF Scores**

Seibel received a range of GAF scores, most of which were assigned little,
minimal, or no weight by ALJ Sloan.  AR 20-23.  The various GAF numbers were as
follows:

| DATE | PRACTITIONER | GAF SCORE |
|------|--------------|-----------|
| June 11, 2010 | Gassner, A.R.N.P. | 45 |
| June 28, 2010 | Glade, A.R.N.P. | 50 |
| August 3, 2010 | Larsen-Kalla, L.M.H.C. | 35 |
| September 20, 2010 | Aulager, M.S.W. | 43 |
| November 16, 2010 | Montgomery, A.R.N.P. | 40 |
| November 24, 2010 | Stanger, M.D. | 52 |
| July 29, 2011 (unsigned) | Montgomery, A.R.N.P. | 40 |
| October 4, 2011 | Waller-Rose, L.I.C.S.W. | 50 |
| June 15, 2012 | Dees, Psy.D. | 45 |

AR 567, 581, 632, 639, 651, 711, 806, 816, 922.  The lowest scores (35-40) reflect
"[s]ome impairment in reality testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant)" or "major impairment in several areas, such as work or school,
family relations, judgment, thinking, or mood."  DSM-IV-TR at 34.  The next group of

1  scores (43-50) indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional

2  rituals, frequent shoplifting)" or "any serious impairment in social, occupational, or

3  school functioning (e.g., no friends, unable to keep a job)." _Id._  The highest score of 52,

4  which was given "some weight" by ALJ Sloan, _see_ AR 21, describes "[m]oderate

5  symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or

6  "moderate difficulty in social, occupational, or school functioning (e.g., few friends,

7  conflicts with peers or co-workers)."  DSM-IV-TR at 34.

8       With one exception, the GAF scores between 35 and 50 were assigned by

9  practitioners who are not acceptable medical sources and whose opinions were

10  discounted as being overly reliant on Seibel's less than fully credible self report.  In

11  addition, many of the scores were provided after seeing Seibel for only a short time or

12  for the first time.  The score of 52 assessed by Dr. Stanger, an examining psychiatrist and

13  acceptable medical source, is more consistent with the other evidence in the record.

14  During the period at issue, Seibel did not manifest any suicidal ideation, obsessional

15  behavior, criminal conduct, or serious or major impairment in social functioning.  Indeed,

16  he had a roommate (described as a girlfriend in multiple places in the record), took trips

17  to attend a funeral in Sacramento and a wedding in Las Vegas, and seemed to have a

18  sufficient number of friends to keep him supplied with daily dosages of marijuana.  The

19  Court therefore concludes that ALJ Sloan committed no error in disregarding the various

20  unjustifiably low GAF scores.

21

22

23

ORDER - 38

### 2.   **Phelps's GAF Scores**

Phelps was also given differing GAF scores, but all of the values fell within the same decile on the GAF scale, namely 51-to-60, which was used to indicate either "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks)" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  _See_ DSM-IV-TR at 34.  Phelps's assigned GAF figures were as follows:

| DATE | PRACTITIONER | GAF SCORE |
|------|--------------|-----------|
| September 24, 2008 | Meinz, Ph.D. | 60 |
| May 9, 2012 | Bowes, M.S.W. | 51 |
| July 18, 2012 | Petaja, Ph.D. | 55 |
| February 12, 2013 | Yun, Ph.D. | 55 |

AR 469, 772, 789, 805.  ALJ Sloan gave "little weight" to the GAF scores.  AR 21-22. She explained that the various practitioners had not explained whether Phelps's symptom severity and her level of functioning were discordant, and if so, which one was worse and therefore reflected in the GAF rating.  _See_ DSM-IV-TR at 33 (when an "individual's symptom severity and level of functioning [were] discordant, the final GAF rating always reflect[ed] the worse of the two").  To the extent that the various GAF scores were based solely on symptom severity, they relied on Phelps's "own descriptions" of her alleged impairments, _see_ AR 22 (citing SSR 96-7p, which was subsequently superseded by SSR 16-3p, effective March 28, 2016), which were not fully credible, and they did not rule out a higher level of functioning.  ALJ Sloan further clarified that the specific GAF scores were snapshot assessments and could not be interpreted as descriptions of

1  permanent levels of functioning, and that the GAF scale bore no "direct correlation to the

2  severity requirements in [the] mental disorders listings."  AR 22 (quoting 65 Fed. Reg.

3  50,746 at 50,764-65 (Aug. 21, 2000)).  The Court agrees with ALJ Sloan that the GAF

4  ratings at issue "do not convey information that further the functional analysis," AR 22,

5  and Phelps's GAF scores, both high and low, were properly ignored.

6  **Conclusion**

7          For the foregoing reasons, the Court ORDERS:

8          (1)     The Commissioner's denial of Anthony M. Seibel's applications for DIB

9  and SSI benefits is AFFIRMED;

10          (2)     The Commissioner's denial of Missy M. Phelps's applications for DIB and

11  SSI benefits is AFFIRMED; and

12          (3)     The Clerk is DIRECTED to enter judgment accordingly and to send a copy

13  of this Order to all counsel of record.

14          IT IS SO ORDERED.

15          Dated this 15th day of February, 2017.

16

17

18                                               Thomas S. Zilly
                                                 United States District Judge

19

20

21

22

23

ORDER - 40